UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| FAIR HOUSING CENTER OF CENTRAL INDIANA, INC., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 1:22-cv-00612-TAB-JPH |
| M&J MANAGEMENT COMPANY, LLC, d/b/a THE SEXTON COMPANIES, et al., | ) ) ) | |
| Defendants. | ) ) | |

**ORDER ON
CROSS MOTIONS FOR SUMMARY JUDGMENT**

## I.      Introduction

Plaintiff alleges the occupancy limits of Defendants' multi-family housing units discriminate against families with minor children in violation of the Fair Housing Act and Indiana Fair Housing Act.  Both sides have filed summary judgment motions based on facts that are largely undisputed.  As explained below, while Plaintiff can establish a *prima facie* case that Defendants' occupancy limits have a disparate impact on families with children, the Court cannot, at this stage, determine whether Defendants have satisfied their burden of showing that the occupancy standard is necessary to achieve substantial, legitimate, nondiscriminatory interests.  A genuine dispute remains as to whether Defendants have done so.  Therefore, both Defendants' motion for summary judgment [Filing No. 67] and Plaintiff's motion for partial summary judgment [Filing No. 69] are denied.

## II.     Background

The following material facts are undisputed.  Plaintiff, Fair Housing Center of Central

Indiana, Inc., is a private, nonprofit Indiana corporation headquartered in Indianapolis that

provides fair housing services throughout the state.  [Filing No. 70-25, at ECF p. 1.]  Plaintiff's

mission is to ensure equal housing opportunities by eliminating housing discrimination through

advocacy, enforcement, education, and outreach.  [Filing No. 70-25, at ECF p. 1.]  Defendants[1]

own and operate multiple multi-family housing units in Indianapolis, including the Carlyle Court

apartments and the Windsor Court apartments in Indianapolis, and the Remington Court

apartments in Mishawaka.  [Filing No. 68-2, at ECF p. 6-8.]  Defendants have an occupancy

standard of two occupants per bedroom that applies to all floor plans, regardless of the age of the

occupants.  [Filing No. 68-2, at ECF p. 13.]  This policy has been in place since at least 1990.

[Filing No. 70-19, at ECF p. 21.]  Under Defendants' policy, a one-bedroom unit can only be

occupied by one to two people, and a two-bedroom unit can only be occupied by one to four

people.  Applicants with occupants that exceed Defendants' occupancy standard are rejected.

[Filing No. 68-2, at ECF p. 19.]

To ensure compliance with the occupancy standard, Defendants conduct semi-annual

inspections.  [Filing No. 70-20, at ECF p. 22.]  If a property manager or leasing agent becomes

aware of a violation of Defendants' occupancy standard, Defendants notify the tenants of the

violation in writing.  [Filing No. 68-2, at ECF p. 21.]  The violating occupants are not required to

pay a transfer fee, move out, or make any changes in the middle of a lease term, but rather

---

[1] Defendants include M&J Management Company, LLC, Sexton Carlyle, LLC, Remington
Court, LLC, and Sexton Windsor, LLC.

violations are addressed at renewal time.  [Filing No. 68-2, at ECF p. 21-22.]  If the occupants do not move or transfer, Defendants give them a 60-day non-renewal notice to vacate.  [Filing No. 68-2, at ECF p. 26.]  If the resident seeks to transfer to a larger unit during the lease period, they must pay a $500 transfer fee.  [Filing No. 68-2, at ECF p. 28.]

On February 20, 2020, Plaintiff received a complaint from a man who alleged that the Carlyle Court Apartments had told his son's family that they had "too many people" to rent a two-bedroom apartment, and the Carlyle Court had no three-bedroom apartments.  [Filing No. 70-25, at ECF p. 2.]  In response to that complaint, Plaintiff began an investigation into the reported occupancy restriction at the Carlyle Court Apartments.  [Filing No. 70-25, at ECF p. 2.]  On June 30, 2020, Plaintiff assigned a fair housing tester to call the Carlyle Court Apartments posing as a potential applicant married with three children.  The tester's call confirmed the two-per-bedroom occupancy restriction.  [Filing No. 70-25, at ECF p. 2.]  Two additional fair housing testers called the Remington Court apartments and Windsor Court apartments respectively posing as potential applicants married with three minor children, and those calls yielded the same result, confirming the two-per-bedroom occupancy restriction.  [Filing No. 70-25, at ECF p. 2.]

In July 2021, Plaintiff filed an administrative complaint with the Indiana Civil Rights Commission alleging Defendants discriminated in connection with renting.  [Filing No. 1, at ECF p. 13.]  The ICRC investigated and found there was "reasonable and probable cause" to believe that the discriminatory practices alleged by Plaintiff occurred at each of the subject apartment complexes.  [Filing No. 1, at ECF p. 13.]  In lieu of litigating in state court or before an ICRC administrative law judge, Plaintiff filed suit in this Court for injunctive, declaratory, and monetary relief against Defendants for discriminating against families with minor children in violation of the FHA and related, supplemental state laws.  [Filing No. 1.]  In response,

Defendants filed a motion for summary judgment as to all of Plaintiff's claims.  [Filing No. 67.]

Plaintiff filed a cross-motion for partial summary judgment as to liability.  [Filing No. 69.]

## III.    Discussion

Summary judgment is appropriate if "the movant shows that there is no genuine dispute

as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R.

Civ. P. 56(a).

> This notion applies equally where, as here, opposing parties each move for
> summary judgment in their favor pursuant to Rule 56.  Indeed, the existence of
> cross-motions for summary judgment does not necessarily mean that there are no
> genuine issues of material fact.  Rather, the process of taking the facts in the light
> most favorable to the non-movant, first for one side and then for the other, may
> reveal that neither side has enough to prevail without a trial.  With cross-motions,
> the court's review of the record requires that the court construe all inferences in
> favor of the party against whom the motion under consideration is made.

*Tyler v. JP Operations, LLC*, 342 F. Supp. 3d 837, 842 (S.D. Ind. 2018) (internal citations,

quotation marks, and brackets omitted).  To defeat summary judgment, the nonmoving party

must set forth specific facts showing that there are genuine issues for trial.  Fed. R. Civ. P. 56(c).

### A.    Standing

As a threshold matter, Defendants claim Plaintiff lacks standing to bring these claims.

[Filing No. 68, at ECF p. 11.]  To establish standing, Plaintiff has the burden of demonstrating

three elements: (1) an injury in fact; (2) fairly traceable to the action of the defendant; that (3) is

likely to be redressed by a favorable decision.  *Lujan v. Defenders of Wildlife*, 504 U.S. 560, 560-

61, 112 S. Ct. 2130 (1992).  This district has found that an organization has an injury for the

purposes of standing where a defendant's alleged actions impair an organization's ability to

further its "essential purposes and goals."  *Indiana State Conf. of Nat'l Ass'n for Advancement of

Colored People v. Lawson*, 326 F. Supp. 3d 646, 659 (S.D. Ind. 2018), *aff'd sub nom. Common

Cause Indiana v. Lawson*, 937 F.3d 944 (7th Cir. 2019).  "If any organization shows a 'drain on

the organization's resources' as a result of challenged government action, the organization can prove actual injury." *Satanic Temple, Inc. v. Rokita*, No. 1:22-cv-01859-JMS-MG, 2023 WL 7016211, at *9 (S.D. Ind. Oct. 25, 2023) (*quoting Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379, 102 S. Ct. 1114 (1982)).

Defendants argue that Plaintiff cannot establish standing because Plaintiff has not shown that its ability to further its essential purposes and goals has been impaired by Defendants' alleged unlawful acts.  [Filing No. 68, at ECF p. 1.]  Defendants cite to a decision from the Fifth Circuit, *Louisiana Fair Hous. Action Cntr., Inc. v. Azalea Garden Properties, LLC*, 82 F.4th 345 (5th Cir. 2013), which they say further stands for the proposition that an organization attempting to establish standing based on expenditure of resources must show that the purported injuries differ from its routine activities.  In that case, the Fifth Circuit found that the Louisiana Fair Housing Action Center (LaFHAC), which "employs 'testers' to ferret out discrimination" did not have standing to pursue its disparate impact claims under the FHA against the defendant apartment complex.  *Id*. at 349.  The Fifth Circuit held LaFHAC "fail[ed] to allege that its activities in response to Azalea Garden's alleged discrimination perceptibly impaired its mission." *Id*. at 354.  Relying on *LaFHAC*, Defendants argue that even if the Court accepted all of Plaintiff's allegations in the complaint as true, Plaintiff still would be unable to establish standing because it has not shown that its ability to further its essential purposes and goals has been impaired by Defendants' alleged unlawful acts.  Instead, they argue, Plaintiff's expenditure of resources all seemingly fall squarely within its routine activities undertaken to fulfill its mission "to eradicate housing discrimination" in Indiana.  [Filing No. 68, at ECF p. 14.]

In response, Plaintiff points out that *LaFHAC* is not controlling in the Seventh Circuit. Plaintiff further argues that the Fifth Circuit's opinion contravenes the U.S. Supreme Court's

longstanding ruling in *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 102 S. Ct. 1114 (1982). In *Havens*, the Supreme Court held that a fair housing organization had standing under the FHA based on its allegations that the defendants' racial steering impaired its ability to provide counseling and referral services and its noneconomic interest in encouraging open housing. *Id.* at 378-79. In *Havens*, the Supreme Court examined the resources and the mission of the fair housing organization known as HOME. The Supreme Court observed that HOME devoted resources to identifying and counteracting the defendants' racially discriminatory steering practices, and that its mission of promoting equal access to housing through counselling and referral services was impaired by the defendants' discrimination. The *Havens* Court concluded this left "no question that the organization suffered injury in fact." *Id.* at 379. The Seventh Circuit has not diverged from the standards set forth in *Havens* like the Fifth Circuit has. On the contrary, the Seventh Circuit has held that organizational standing "requires only a minimal showing of injury." *Crawford v. Marion County Election Board*, 472 F.3d 949, 951 (7th Cir. 2007).

Recently, the U.S. Supreme Court declined to extend *Havens*, holding that individual doctors lacked Article III standing to challenge the FDA's actions involving the regulation of the drug mifepristone. *Food & Drug Admin. v. Alliance for Hippocratic Medicine*, 602 U.S. 367, 396, 144 S. Ct. 1540 (2024) ("*Havens* was an unusual case, and this Court has been careful not to extend the *Havens* holding beyond its context. So true here."). The Supreme Court noted that an organization "cannot spend its way into standing simply be expending money to gather information and advocate against the defendant's action." *Alliance for Hippocratic Med.*, 602 U.S. at 394. The Supreme Court distinguished *Havens* from the mifepristone case by noting that

in *Havens*, Havens' actions directly affected and interfered with a housing counseling organization's core business activities.  *Id.*

The parties briefed the issue of standing before the Supreme Court published its recent decision in *Alliance for Hippocratic Medicine*, so they did not evaluate the present scenario in its context.  However, this Court has previously held—while relying on *Havens*—that this same Plaintiff's diversion of resources to investigate a defendant's discriminatory housing practices and the consequent frustration of its mission is sufficient to confer standing.  *See Fair Housing Center of Central Indiana, Inc. v. Smitley*, No. 1:16-cv-880-WTL-DML, 2018 WL 3237860, at *2 (S.D. Ind. July 3, 2018)* ("A fair housing organization may recover damages caused by diversion of resources.  *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 n.19 (1982).  The Seventh Circuit has characterized diversion of resources as equivalent to the opportunity costs of pursuing the investigation of the defendant's practices.  A fair housing organization may also suffer redressable injury to its non-economic interest in encouraging open housing, or frustration of mission."  (Internal citations and quotation marks omitted)).

The Fair Housing Act identifies an "aggrieved person" as including any person who "believes that such person will be injured by a discriminatory housing practice that is about to occur."  42 U.S.C. § 3602(i)(2).  Plaintiff meets this definition.  In addition, Plaintiff cites to evidence documenting 104.75 hours in staff time it spent responding to a complaint about Defendants' refusal to permit a couple with three young children from renting a two-bedroom apartment, conducting an investigation of Defendants' policies through testing and former tenant surveys, researching local occupancy ordinances in relation to Defendants' numerical occupancy policies, and analyzing census data to determine the effects of Defendants' policies on families with children.  [Filing No. 77, at ECF p. 10.]  If Defendants had not implemented this

discriminatory policy, Plaintiff could have invested the staff hours it spent counseling and investigating these policies into affirmative, proactive policies designed to promote and protect equal opportunities in housing in Central Indiana and beyond.  Furthermore, Plaintiff states that it "made a calculated decision in this case to refrain from seeking monetary damages for its impaired mission in order to promote settlement."  [Filing No. 77, at ECF p. 11.]  Plaintiff cautions that its decision should not be misinterpreted to mean that Plaintiff's mission was not impaired.

In *Smitley*, this Court found the same Plaintiff's diversion of resources to investigate a different defendant's discriminatory housing practices and the consequent frustration of its mission conferred standing in a situation involving a single housing unit, no testing, and a fraction of the resources in comparison to the present case.  *Smitley*, No. 1:16-cv-880-WTL-DML, 2018 WL 3237860, at *2.   Plaintiff's damages met standing requirements in *Smitley*, and those requirements have also been met here.  This is in line with, and does not stray beyond, the longstanding *Havens* precedent.  Accordingly, for all these reasons, Plaintiff meets the standing requirements to bring its discrimination claims.

### B.      FHA: Familial status discrimination

Defendants do not dispute that they have an occupancy policy restricting occupancy in all their dwellings to no more than two persons per bedroom, regardless of the square footage of the unit and with no exceptions for households with an infant or small children.  Plaintiff argues that Defendants' occupancy restriction has a discriminatory effect on families with children.  [Filing No. 70, at ECF p. 13.]  Under the FHA, it is unlawful to refuse to rent housing to any person because of their familial status.  42 U.S.C. § 3604(a).  "Familial status" is defined as "one or more individuals (who have not attained the age of 18 years)" living with a parent or another

person having legal custody of them or within a designee of such person. 42 U.S.C. § 3602(k). The IFHA mirrors the FHA. Ind. Code. § 22-9.5-1-1(3).

FHA claims may proceed under a disparate treatment or a disparate impact theory of liability. *See Texas Dept. of Housing and Comm. Affairs v. Inclusive Communities Project, Inc.*, 576 U.S. 519, 524 (2015). In this case, Plaintiff clarifies[2] that it is only pursuing a disparate impact claim. [Filing No. 77, at ECF p. 12.] "In contrast to disparate treatment cases, where a plaintiff must establish that the defendant had a discriminatory intent or motive, a plaintiff bringing a disparate-impact claim challenges practices that have disproportionately adverse effects on minorities and are otherwise unjustified by a legitimate rationale." *Inclusive Communities Project*, 576 U.S. at 524 (internal citation and quotation marks omitted).

To prevail on a disparate impact claim under the FHA, the plaintiff must establish a *prima facie* case and show that "the defendant's practices have a disproportionately adverse effect on the protected class and are otherwise unjustified by a legitimate rationale." *Trimuel v. Chicago Housing Auth.*, 695 F. Supp. 3d 972, 982 (N.D. Ill. 2023). Once the plaintiff has established a *prima facie* case, the burden shifts to the defendant to prove that the challenged practice is necessary to achieve one or more substantial, legitimate, nondiscriminatory interests. Inclusive Communities Project, 576 at 524 (citing 24 C.F.R. § 100.500(c)(2)). If the defendant satisfies its burden of proof, then the plaintiff may still prevail upon proving that the substantial, legitimate, nondiscriminatory interests supporting the challenged practice could be served by another practice with a less discriminatory effect. 24 C.F.R. § 100.500(c)(3).

---

[2] Plaintiff argues that the Court should deny Defendants' motion for summary judgment insomuch as it asks the Court to enter summary judgment in Defendants' favor because Plaintiff cannot establish a disparate treatment. [Filing No. 77, at ECF p. 12.] Since Plaintiff does not allege a claim based on a disparate treatment theory, Defendants' motion is denied as moot as it relates to this argument.

i.      *Prima facie case*

To establish a *prima facie* case of disparate impact, a plaintiff must first identify an outwardly neutral policy and compare how that policy affects a protected class compared with others. *Inclusive Communities Project*, 576 U.S. at 527, 542-43.  *See also Dunnivan v. Mitchell*, No. 1:21-cv-02271-SEB-TAB, 2022 WL 3716528, at *3 (S.D. Ind. Aug. 29, 2022) ("To allege disparate impact liability, a plaintiff first must make a *prima facie* showing of disparate impact. That is, the plaintiff has the burden of proving that a challenged practice caused or predictably will cause a discriminatory effect."  (Internal citations and quotation marks omitted)). Defendants' admitted two-per-bedroom occupancy restriction is the outwardly neutral policy challenged by Plaintiff.  That policy impacts a protected class because it excludes households with three or more minor children from renting at Defendants' apartment complexes.  To establish the impact of Defendants' occupancy restriction on families with multiple children, Plaintiff retained expert James Colbert[3], a data manager with The Polis Center at Indiana University Purdue University Indianapolis.  [Filing No. 70-24.]

Plaintiff provides statistical evidence in Colbert's report showing significant disparities—excluding rental households of five or more people with minor children from renting a two-bedroom unit at a rate at least 59 times greater than similar households without minor children and excluding rental households of three or more people with minor children from renting a one-bedroom unit at a rate 8 to 16 times greater than similar households without minor children. [Filing No. 70-24, at ECF p. 9.]  Plaintiff argues that these disparities are significantly larger than

---

[3] On July 30, 2024, Defendants moved to exclude Colbert's report and exclude Colbert from offering expert testimony.  [Filing No. 84.]  The Court noted that it will treat the motion as a Daubert motion related to trial and will not address it in relation to the pending summary judgment motions.  [Filing No. 86.]

disparities found to establish a disparate impact in other cases.  *See, e.g., Gashi v. Grubb & Ellis Prop. Mgmt. Servs., Inc.*, 801 F. Supp. 2d 12, 17 (D. Conn. 2011) ("By demonstrating that 30.76% of households with children are affected by the occupancy policy, while only 9.88% of households without children are affected, the Gashis set forth a prima facie case of disparate impact."); *Sw. Fair Hous. Council, Inc. v. Maricopa Domestic Water Improvement Dist.*, 17 F.4th 950, 964 (9th Cir. 2021) (affected public housing customers were nearly four times as likely to be African American and nearly twice as likely to be Native American than to be white).

Defendants argue that Plaintiff cannot show that Defendants' occupancy standard caused a discriminatory effect because Plaintiff is unable to meet the "robust causality" requirement articulated in *Inclusive Communities*.  [Filing No. 68, at ECF p. 17-24.]  *See, e.g., Inclusive Communities Project*, 576 U.S. at 542 ("[A] disparate-impact claim that relies on a statistical disparity must fail if the plaintiff cannot point to a defendant's policy or policies causing that disparity.  A robust causality requirement ensures that racial imbalance does not, without more, establish a *prima facie* case of disparate impact and thus protects defendants from being held liable for racial disparities they did not create."  (Internal quotation marks, brackets, and ellipses omitted)).

To support this argument, Defendants once again rely on a Fifth Circuit decision.  The Fifth Circuit construes "robust causality" as requiring a plaintiff to show not that a defendant's policy disproportionately excludes minority applicants, but that the defendant's action created the underlying demographics of the population affected by the policy.  *See, e.g., Inclusive Communities Project, Inc. v. Lincoln Property Co.*, 920 F.3d 890, 902-05 (5th Cir. 2019) (finding it is not enough that a plaintiff shows that a disparity merely exists, but rather applying a stricter version of the burden-shifting analysis requiring the plaintiff to show that the defendant's action

created the underlying demographics of the population affected by the policy).  Plaintiff describes the Fifth Circuit's interpretation of this requirement as unique.  Plaintiff acknowledges that it must demonstrate a robust causality between the disparity and the Defendants' policy, and Plaintiff recognizes that this requirement protects defendants from being held liable for disparities they did not create.  However, Plaintiff argues that no other circuits have interpreted *Inclusive Communities'* robust causality requirement like the Fifth Circuit, citing decisions from the Second, Fourth, Eleventh, and Ninth Circuit.  [Filing No. 77, at ECF p. 17-18.]

The Seventh Circuit has not considered the causation element of a *prima facie* case of disparate impact under the FHA since the Supreme Court's *Inclusive Communities* decision.  *City of Joliet v. New W., L.P.,* 825 F.3d 827, 830 (7th Cir. 2016), cited by Defendants, did not discuss the application of robust causality.  Nevertheless, there is no indication the Seventh Circuit would follow the Fifth Circuit's reasoning in a case of an identifiable exclusionary policy such as Defendants' policy here.  Earlier this year, in a Title VII case involving a test that disproportionately disqualified women, the Seventh Circuit followed traditional disparate-impact analysis and held that the plaintiff had to show that the practice in question had caused the exclusion of applicants because of their membership in a protected group.  *Erdman v. City of Madison*, 91 F.4th 465, 471 (7th Cir. 2024).  In *Fair Housing Center of Central Indiana v. Rainbow Realty Group, Inc*., No. 1:17-cv-1782-JMS-TAB, 2022 WL 6158365, at *15 (S.D. Ind. Oct. 7, 2022), this Court found that the plaintiff (which is the same Plaintiff in this case) failed to establish a *prima facie* case of disparate impact because the plaintiff relied on a disparity that "Defendants did not create[.]"

This case is different.  Here, Plaintiff identifies a direct connection between Defendants' occupancy restriction and its disproportionate exclusion of families with children, establishing

the required robust causality.  Causality is palpable since it is undisputed that Defendants

adopted the two-per-bedroom policy in question and capped occupancy on their rental units.  No

other party had any involvement in the adoption or implementation of that policy.  Defendants

fail to acknowledge the broad swath of statistical evidence submitted by Plaintiffs in support of

their arguments.  That evidence establishes that Defendants' occupancy restriction

disproportionately excludes rental households with children compared to rental households

without children, whether looking at the demographics of rental households in Indiana, Marion

County, St. Joseph County, or the census areas where Carlyle Court, Windsor Court, or

Remington Court Apartments are located.

Plaintiff further points out that the actual numbers of families with children at

Defendants' properties confirm the strong predictable discriminatory effect from Defendants'

policy.  [Filing No. 77, at ECF p. 20-21.]  Defendants admit that as of August 2021, only 30

households with minor children were renting at the 302-unit Carlyle Court Apartments; only 33

households with minor children were renting at the 342-unit Windsor Court Apartments; and as

of August 2022, only 11 households with minor children were renting at the 162-unit Remington

Court Apartments.  [Filing No. 70-3, at ECF p. 6.]  And while these figures—reflecting that

households with minor children occupy 10% or fewer units at Defendants' complexes—are

striking, Plaintiff further clarifies that it is not attempting to base its disparate impact analysis

solely on that demographic disparity without linking to any policy of Defendants.  [Filing No.

77, at ECF p. 21.]  Rather, Defendants admit they have implemented and enforced a policy

prohibiting any more than two persons per bedroom, no matter the age of the occupants or

attributes of the particular unit[4]  Plaintiff both identified Defendants' policy and submitted census

data showing that Defendants' restriction predictably results in the exclusion of more households

with minor children than households without children.  This predictable discriminatory effect

meets the robust causality requirement for establishing a *prima facie* case of disparate impact.

ii.   *Legally sufficient justification*

Since Plaintiff has established its *prima facie* case, the burden of proof shifts to

Defendants, and summary judgment must be entered in favor of Plaintiff unless Defendants can

establish that their occupancy restriction "is necessary to achieve one or more substantial,

legitimate, nondiscriminatory interests."  24 C.F.R § 100.500(b)(1)(i), (c)(2).  A legally sufficient

justification "must be supported by evidence and may not be hypothetical or speculative."  24

C.F.R. § 100.500(b)(2).

However, the Court is unable to determine at the summary judgment stage whether

Defendants can establish the necessity of their occupancy restriction.  Defendants have presented

evidence, but some of it is hypothetical or speculative.  The Court cannot weigh the strength of

the evidence at the summary judgment stage.  *See, e.g., United States v. Funds in Amount of One*

*Hundred Thousand One Hundred & Twenty Dollars ($100,120.00)*, 730 F.3d 711, 717 (7th Cir.

2013) ("To reject testimony because it is unsubstantiated and self-serving is to weigh the strength

of the evidence or make credibility determinations—tasks belonging to the trier of fact.").  Thus,

a genuine dispute remains regarding these material facts and whether Defendants have

---

[4] Defendants claim that Colbert's report manipulates findings to conclude that Defendants'
occupancy policy must be the only reasonable explanation fewer families with children live in
Defendants' units.  Yet, Defendants argue, "Colbert's Report fails to consider key factors relevant
to why an apartment complex with less square footage, small appliances, no backyard, and
limited parking might have fewer households with children than other rental households in the
rea with larger accommodations."  [Filing No. 68, at ECF p. 23.]  These factors are better
addressed at the burden-shifting step in the analysis, below.

demonstrated that the occupancy standard is necessary to achieve substantial, legitimate, nondiscriminatory interests.

In Defendants' responses to interrogatories, depositions, and expert report, Plaintiff claims that Defendants failed to identify any evidence supporting their asserted justifications for their two-per-bedroom occupancy restriction.  Plaintiff further argues that Defendants' expert, Los Angeles property manager Sandra Clark, provided no substantive evidence justifying the two-per-bedroom occupancy restriction.  [Filing No. 70, at ECF p. 27.]  Defendants counter that the occupancy standard is necessary to achieve numerous legitimate interests and that each interest is supported with evidence.  [Filing No. 76, at ECF p. 1.]

Defendants argue that the occupancy standard is intended to ensure a safe and enjoyable environment for tenants and is necessary for Defendants' business.  [Filing No. 76, at ECF p. 8.] Defendants broadly state that they have a substantial, legitimate, nondiscriminatory interest in maintaining a desirable, marketable, and enjoyable living environment for current and prospective tenants.  [Filing No. 76, at ECF p. 9.]  Thus, Defendants argue that they must ensure their rental units meet this standard by providing things like adequate parking, sufficient appliances, and ample hot water, and also that unattractive factors do not cause current tenants to leave or deter potential tenants, such as excessive noise, overcrowded common areas, excess trash, rodents, and mold.  [Filing No. 76, at ECF p. 9.]  These broad claims state valid business goals, but Defendants lack sufficient evidence supporting Defendants' asserted justification for the occupancy policy that the Court has found has a disparate impact on a protected group, and Defendants rely too heavily on hypothetical concerns.

Relatedly, Defendants argue that maintaining fiscal solvency is a valid legitimate interest under the FHA, and a change to the occupancy policy would have a negative fiscal impact.

Defendants note that the occupancy standard is designed to prevent overcrowding, "which negatively affects the health and safety of tenants and strains infrastructure like plumbing." [Filing No. 68, at ECF p. 26.]  Defendants argue that overcrowding "increases Defendants' costs through heightened utility bills, more maintenance needs, and additional wear and tear which can more quickly devalue the property."  [Filing No. 68, at ECF p. 26.]  Plaintiff concedes that "[t]here is no dispute that overcrowding may have negative effects[.]"  [Filing No. 70, at ECF p. 28.]  However, Plaintiff argues that Defendants' expert, Clark, relies on overbroad, speculative claims.  [Filing No. 70, at ECF p. 20.]

The Court has reviewed Clark's report.  [Filing No. 68-5.]  While some of her findings are detailed and supported, as well as largely self-explanatory, Clark's report also contains broad, speculative statements.  Clark posits that more people in units naturally results in more possessions and storage, which could lead to overcrowded conditions in the unit.  She also points out that negative effects from increased density are widely known and generally accepted in the housing industry.  [Filing No. 68-5, at ECF p. 20.]  "In ruling on cross motions for summary judgment, the Court takes the motions one at a time, viewing and reciting the evidence and drawing all reasonable inferences in favor of the non-moving party."  *Downing v. SMC Corporation of America*, 649 F. Supp. 3d 725, 728 (S.D. Ind. Jan. 5, 2023) (internal citation and quotation marks omitted).  Many of Clark's statements, as explained below, are broad.  However, there is not enough to support Defendants' position that the occupancy restriction is necessary to support substantial, legitimate interests without weighing the evidence and making some judgment calls about Clark's credibility.  The Court cannot do that at the summary judgment stage.

16

In addition, Defendants' interrogatory responses restate the factors set forth in a United States Department of Housing and Urban Development (HUD) guidance memo[5] referred to as the "Keating memo."  The memo provides:

> The Department believes that an occupancy policy of two persons in a bedroom, as a general rule, is reasonable under the Fair Housing Act. . . .  However, the reasonableness of any occupancy policy is rebuttable, and neither [this memorandum nor a prior memorandum] implies that the Department will determine compliance with the Fair Housing Act based solely on the number of people permitted in each bedroom.

Frank Keating, Fair Housing Enforcement—Occupancy Standards; *Notice of Statement of Policy, 63 Fed. Reg. 70982, 70984, 1998 WL 886476 (Dec. 22, 1998)*.  The Keating memo sets forth additional factors HUD will consider, including: the number and size of sleeping areas or bedrooms; the overall size of the dwelling unit; the age of children; the configuration of the unit; other physical limitations of the dwelling, such as capacity of septic, sewer, or other building systems; state and local laws; and any other relevant factors.  *Id.*  The Keating memo does not establish that an occupancy limitation of two persons per bedroom is reasonable per se; rather, it sets forth additional factors that may be relevant in assessing whether a numerical occupancy restriction constitutes unlawful discrimination.

Defendants acknowledge that a factor that weighs against them is that their occupancy standard does not consider the age of children.  However, they argue that the remaining factors demonstrate that the occupancy standard is necessary and reasonable.

---

[5] The parties briefed this matter before the Supreme Court's decision in *Loper Bright Enterprises v. Raimondo*, 603 U.S. __, 144 S. Ct. 2244 (2024), which overruled *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S. Ct. 2778 (1984), and held that courts need not defer to an agency's interpretation of the law simply because a statute is ambiguous.  Here, however, neither the parties nor the Court defer or look to HUD's Keating memo as anything more than guidance and suggesting factors that may be helpful in determining the reasonableness of Defendants' occupancy standard.

In relation to the capacity of septic, sewer, or other building systems, Defendants claim that the occupancy standard is necessary due to smaller appliances, smaller water heaters, and general physical parameters which limit Defendants' ability to place larger appliances in the space (and, relatedly, utility costs and maintenance expenses). [Filing No. 68, at ECF p. 7-9.] Clark's report details that none of the apartments in Defendants' properties have windows in their bathrooms, restricting the flow of fresh air. [Filing No. 68-5, at ECF p. 19.] Clark also notes that many of Defendants' apartments contain compact 30-gallon water heaters, which is designed to service 1-2 persons. [Filing No. 68-5, at ECF p. 19.] Relatedly, in relation to water heaters, Defendants argue that they charge a flat fee for water, sewer, and trash, and increased occupancy would result in increased bills, as well as strain on plumbing. These concerns, and the associated evidence provided by Defendants, provide some support for the occupancy standard.

However, the Court is unable to conclude at summary judgment that this evidence is sufficient, as the remainder of Defendants' cited reasons are more tenuous. Defendants maintain that the occupancy standard is necessary to prevent over-crowded conditions, which can negatively affect the health and safety of tenants, in addition to increased costs for the owner. [Filing No. 68, at ECF p. 5.] Plaintiff argues that these statements are speculative, although Plaintiff does not otherwise contest Defendants' expert report, present contrary evidence, or push back against these claims. Nevertheless, the burden of providing a legally sufficient justification for the policy falls on Defendants at this step in the analysis. *See* 24 C.F.R. § 100.500(c)(2) ("Once the charging party or plaintiff satisfies the burden of proof set forth in paragraph (c)(1) of this section, the respondent or defendant has the burden of proving that the challenged practice is necessary to achieve one or more substantial, legitimate, nondiscriminatory interests of the respondent or defendant."). And Defendants must provide evidence, not merely hypothetical

concerns and speculation.  24 C.F.R. § 100.500(b)(2).  Simply stating that the standard is necessary to prevent overcrowded conditions, without any evidentiary support, does not support Defendants' claim.

Defendants also argue—citing the square footage and testimony of their expert, Clark—that the majority of the bedrooms at the apartments are "small," not large bedrooms, and none of the units at issue have a den or a study.  [Filing No. 68, at ECF p. 29.]  What exactly does this mean?  Defendants do not provide any citations to evidence in support of this argument in their brief.  Furthermore, the claim is somewhat contradicted by Clark's report, which states that "[i]t may be reasonable to allow dens and lofts to be converted to sleeping areas, but those do not exist in the majority of the Sexton properties."  [Filing No. 68-5, at ECF p. 21.]  "None" and "do not exist in the majority" are not equivalent statements.  Moreover, the lack of a den or study may be concrete evidence in support of the occupancy standard (if true), but Clark's vague assertion that the units are "small" is not objectively measurable.  Clark herself waivered on this statement.  When pushed during her deposition as to whether Defendants' apartments were small, Clark provided inconsistent testimony, stating that some apartments are "not too bad" or "more average."  [Filing No. 68-5, at ECF p. 3.]

Relatedly, Defendants also claim that the occupancy standard is necessary to ensure residential parking is satisfactory and marketable.  [Filing No. 68, at ECF p. 6.]  Defendants describe the number of parking spaces available at each building and note that they receive complaints about limited parking spaces and struggle to accommodate current residents.  [Filing No. 68, at ECF p. 7.]  In response, Plaintiff notes that Defendants' Carlyle and Windsor Court complexes have 60% and 75% more parking than the one spot per unit required by the Marion County code.  [Filing No. 77, at ECF p. 23; Filing No. 71, at ECF p. 5.]  St. Joseph County,

where Remington Court apartments are located, also requires only one parking spot per unit.[6]
Clark claims that increased occupancy density will lead to shortages of onsite parking spaces and
increased dissatisfaction.  However, Clark provides no further evidence to support this claim, and
without weighing the evidence the Court cannot discern at this stage whether Clark relies on
anything more than speculation or hypothetical concerns, or whether these claims are self-
evident enough on their own.

There is no dispute that the parking options are finite, or that additional tenants
potentially could request additional parking.  However, Defendants have not provided any
projections, statistical evidence, or other support beyond claiming that they generally receive
complaints about parking.  The record before the Court does not provide enough evidence to
support Defendants' claims regarding parking concerns.   Moreover, while older children could
potentially require additional parking, the addition of more infants and children under 16 would
not cause these parking-related fears to come to fruition.  Yet again, this requires some level of
speculation.

Defendants further assert that incorporating local law, as suggested by the Keating memo,
such as the Code of the Health & Hospital Corporation of Marion County, favors a finding of
reasonableness.  [Filing No. 68, at ECF p. 30.]  Defendants argue that "[a]dherence to Marion
County's Code requires the majority of Defendants' units to be occupied by no more than two
persons per bedroom."  [Filing No. 68, at ECF p. 30.]  To make this claim, Defendants rely on
Marion County HHC Code § 10-801, which states that a "room to be used for sleeping" must

---

[6] Plaintiff also asks that the Court take judicial notice of the off-street parking regulations of St.
Joseph County, Indiana.  [Filing No. 78.]  The Court grants Plaintiff's motion.

have 170 square feet in order to legally accommodate three occupants (70 square feet for the first

occupant, and additional 50 square feet for each additional occupant).

However, Defendants' occupancy restriction differs from the Marion County code.

Marion County HHC Code § 10-207, states: " 'Occupant' means any individual over one year of

age living, sleeping, cooking or eating in or having possession of a dwelling unit or a rooming

unit." Thus, Marion County excludes infants under one year old from calculating occupants,

while Defendants do not. Thus, this factor does not completely weigh in Defendants' favor.

Additionally, a material dispute exists regarding how to interpret the Marion County

code, because it does not explicitly define "a room to be used for sleeping." Defendants ask the

Court to limit the term to bedrooms, rather than "habitable rooms." [Filing No. 68, at ECF p.

30.] Plaintiff argues that this would violate norms of statutory construction and makes detailed

arguments as to why "rooms used for sleeping" go beyond just bedrooms. [Filing No. 80, at ECF

P. 14-15.] Plaintiff argues that if only bedrooms can be categorized as "rooms used for sleeping,"

then many of Defendants' smaller one-bedroom units would be legally limited to only one

person, because the bedrooms are under 120 square feet.

Plaintiff also argues that Defendants failed to identify which units they contend would not

comply with the Marion County code were they to increase occupancy beyond two persons per

bedroom. [Filing No. 77, at ECF p. 29.] When asked to identify which units Defendants

believed would be noncompliant, Defendants' Rule 30(b)(6) designee, Paula Condon, testified

that she did not know. [Filing No. 70-19, at ECF p. 58-59). In their reply brief, Defendants

identify a list of unit types and specify the square footage of the bedrooms in those units. [Filing

No. 79, at ECF p. 15.] Plaintiff takes issue with the fact that Defendants waited until their reply

brief to be so specific.  However, the Court allowed Plaintiff to file a surreply to address those concerns.

Defendants analyzed the square footage of all rooms in their apartments and compared them with the minimum square footage required for "sleeping rooms" under the Marion County code.  [Filing No. 79, at ECF p. 14-15.]   However, not all of Defendants' complexes are in Marion County.  Remington Court, for example, is located in St. Joseph County.  Thus, alleged compliance with the Marion County code may not serve as a legitimate justification for Defendants' blanket policy used in all locations.  Moreover, as already noted, a dispute remains regarding how to interpret the Marion County code and whether it supports Defendants' policies.

At bottom, a genuine issue of material fact remains as to whether Defendants can demonstrate a legitimate, nondiscriminatory interest for their occupancy standard.  Thus, summary judgment is denied.  At trial, Defendants will have to demonstrate that the occupancy restriction is necessary to achieve one or more substantial, legitimate, non-discriminatory interests.  At that time, the Court will be able to weigh the strength of the evidence and credibility of witnesses.  At this stage, however, the Court finds too much uncertainty exists to support summary judgment.

**IV.     Conclusion**

For these reasons, Plaintiff's motion to take judicial notice [Filing No. 78] is granted, but

Defendants' motion for summary judgment [Filing No. 67] and Plaintiff's motion for partial

summary judgment [Filing No. 69] are denied.

This matter remains set for a final pretrial conference at 1:30 p.m. on October 29, 2024,

and a bench trial at 9 a.m. on November 12, 2024.

Date: 8/19/2024

Tim A. Baker
United States Magistrate Judge
Southern District of Indiana

Distribution:

All ECF-registered counsel of record via email