UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

FAIR HOUSING CENTER OF CENTRAL )
INDIANA, INC., )
)
Plaintiff, )
)
v. )    No. 1:22-cv-00612-TAB-JPH
)
M&J MANAGEMENT COMPANY, LLC, d/b/a )
THE SEXTON COMPANIES, )
SEXTON CARLYLE LLC, )
REMINGTON COURT LLC, )
SEXTON WINDSOR, LLC, )
)
Defendants. )

## ORDER FOLLOWING BENCH TRIAL

### I.    Introduction

Plaintiff Fair Housing Center of Central Indiana claims Defendants[1] use an occupancy standard that discriminates based on familial status in violation of the Fair Housing Act and Indiana Fair Housing Act. The Court held a three-day bench trial on November 12, 13, and 14, 2024, and now issues its findings of fact and conclusions of law. As discussed below, Plaintiff failed to show Defendants violated any state or federal fair housing laws. Therefore, Plaintiff's claims are denied with prejudice, and judgment shall issue in Defendants' favor.

---

[1] Defendants include M&J Management Company, LLC, Sexton Carlyle, LLC, Remington Court, LLC, and Sexton Windsor, LLC.

II.     **Findings of Fact**

    **A.  The Parties**

Plaintiff is a private, non-profit Indiana corporation headquartered in Indianapolis that provides fair housing services throughout the state.  Plaintiff's mission is to ensure and enhance equal housing opportunities by eliminating housing discrimination through advocacy, enforcement, education, and outreach.  Plaintiff receives 1,650 to 1,800 complaints and inquiries per year from the public, though typically only 30-40 complaints per year relate to minor children.

Defendants have been in the business of developing and renting apartment complexes in Indiana since 1962 and manage around 5,000 total rental units in the state, including Carlyle Court Apartments and Windsor Court Apartments in Indianapolis and Remington Court Apartments in Mishawaka.  The Carlyle Court Apartments contain approximately 302 one- and two-bedroom apartments available to rent to members of the public.  According to Carlyle's website, there are 158 one-bedroom units ranging from 470 to 660 square feet and 144 two-bedroom units ranging from 820 to 1,140 square feet.  The Windsor Court Apartments contain approximately 342 one- and two-bedroom apartments.  Of those, according to Windsor's website, there are 182 one-bedroom units ranging from 470 to 660 square feet, and 160 two-bedroom units ranging from 870 to 1,140 square feet.  The Remington Court Apartments contain approximately 164 one- and two-bedroom apartments.  According to Remington's website, there are 80 one-bedroom units ranging from 467 to 644 square feet and 84 two-bedroom units ranging from 917 to 1,075 square feet.

**B.**      **Description of Defendants' Properties at Issue**

All the apartment buildings at the three complexes at issue are two stories with stairs instead of elevators.  In several floor plans, the square footage of the bedroom is not large enough for a king-size bed.  Rather, the room would only accommodate at most a queen-sized bed with a single nightstand.  All of Defendants' properties house families with children.  An employee of Plaintiff that visited the properties saw evidence of children living at the apartment complexes because he saw toys, little shoes, and other items indicating children were present.  These properties all have amenities that would also attract children, such as swimming pools, green spaces, lakes, and ponds.  To ensure the safety of tenants and guests, eliminate liability, and maintain the properties' reputation and desirability, occupants of all Defendants' properties are subject to a variety of rules and regulations.

Defendants' rules and regulations provide that no one under 18 is permitted in the pool, club house, or billiard rooms without an adult resident present.  Children also must be accompanied by an adult if utilizing Defendants' lakes or ponds.  None of the pools at Carlyle, Windsor, or Remington has lifeguards.  In addition, no one under 18 is allowed in a hot tub or jacuzzi, but there are no hot tubs, jacuzzies, or billiards rooms at the three properties that are the subject of this lawsuit.  Similarly, no one under 18 may use the tennis courts, but none of the three properties have tennis courts.  [*See* Exhibit 41-15.]  None of Defendants' properties have or have ever maintained "adults only" times to use the amenities.

Each of Defendants' individual apartment complexes employs maintenance staff.  For example, Windsor employs three maintenance employees who are responsible for maintaining the common areas, including the grounds, trash compactor area, common hallways, common laundry rooms, and parking areas, and responding to tenant's maintenance requests.  The

individual properties, not tenants, are responsible for maintenance expenses. Common issues include clogged garbage disposals and appliances such as microwaves, stoves, and refrigerators not working. Defendants also utilize third-party carpet and cleaning services in common areas.

Defendants provide parking to residents and guests as part of their business plan because parking is an important factor to most current and prospective tenants. However, all three of the properties at issue have limited parking for residents and guests. At Carlyle, there are 408 parking spaces, 60 carports, and 17 garages, totaling 485 parking spaces, which is 1.61 parking spaces per unit. At Remington, there are 225 parking spaces, 24 carports, and 56 garages, totaling 305 total spaces, which averages to 1.86 spots per unit. At Windsor, there are 495 parking spaces, 81 carports, and 25 garages, totaling 601 spaces, or 1.75 spaces per unit. [Filing No. 135, at ECF p. 40, 42, 46.] It is not possible to build or add parking at Remington, and adding parking spots at Carlyle or Windsor would not be possible without taking away valued greenspace and landscaping. These complexes do not have available street parking to accommodate additional occupants or guests because they are located on busy streets, intersections, and major throughfares.

Many appliances at Defendants' units are not full size. Most of the microwaves are compact. Refrigerators start at 12 cubic feet and even in two-bedroom apartments are only 17 cubic feet. In most one-bedroom units, the stove is only 24 inches wide, as opposed to a traditional 30-inch-wide stove. The 24-inch stove only has one larger burner, with three smaller burners. It is narrower and has a smaller capacity than a traditional 30-inch stove, which limits its usage. For instance, it does not allow for standard cookie sheets or large turkeys. If a one-bedroom unit has in-unit laundry, the washer and dryers are apartment-sized stackable models. Most of Defendants' apartments cannot accommodate larger models because they lack

appropriate plumbing.  For apartments that do not have in-unit laundry, there is one coin-operated, full-size washer and dryer in the common hallway or entryway of the building for tenants to access.

Most of the water heaters are 30-gallon or 40-gallon.  Due to space restrictions, Defendants cannot insert larger water heaters, and water heaters cannot be moved to alternative spaces in the units without major construction and plumbing renovations.  In some floor plans, water heaters are located under cabinets, further preventing installation of larger water heaters. Maintenance already receives requests about lack of sustained hot water.  In addition, trash bills for the individual properties are based on the amount of trash that needs to be collected, so the collection fees fluctuate.  For example, at Carlyle, there are four trash containers.  Two are picked up six times a week, and the other two are picked up three times per week.  The individual properties are also responsible for paying the bills for water and sewage, and these expenses similarly vary with usage.  Tenants are charged a flat fee for utilities, and that flat fee is not enough to cover the individual properties' expenses for water, sewage, and trash.

Tenants at Defendants' properties are responsible for setting up and paying their own internet, gas, and electricity.  However, if an apartment unit is empty, Defendants must pay the electricity and gas for that space.  Defendants pay for internet in club houses as well as electricity and gas in the common areas, including hallways, stairs, and shared laundry rooms.  In addition, every unit is checked upon move-out for bedbugs or any kind of infestation, and all individual properties have third-party exterminators who come once a week for general treatment, and more if needed for special issues.  The individual properties are billed for these services, rather than tenants.  The need for exterminators and additional treatments increases as occupancy increases.

C.      **Defendants' Occupancy Standard: Two Persons Per Bedroom**

Defendants strive to have an outstanding reputation in the apartment industry. Defendants' properties all have a waitlist and high occupancy rates, as well as a quick turnover when units do become available.  [Filing No. 135, at ECF p. 51-53.]  Defendants implement many policies and procedures to maintain clean, respectable, desirable, and affordable apartments.  One policy employed is the enforcement of an occupancy standard of two occupants per bedroom that applies to all floor plans, regardless of the square footage of the unit and regardless of the age of the occupants.  This policy has been in place since at least 1990.  Under Defendants' occupancy standard, a one-bedroom unit can only be rented to and occupied by one or two people, and a two-bedroom unit can only be occupied by between one and four people. Defendants have three-bedroom units at properties not at issue in this lawsuit.  Defendants do not make exceptions for children under any age.

The purpose of Defendants' occupancy standard is to limit Defendants' liability as an owner and manager, while also maintaining an enjoyable, desirable, and safe community for the residents. Increasing occupancy impacts desirability for tenants at Defendants' properties and would result in more turnover because increasing the number of people on a property results in a less pleasant experience for tenants.  Increasing the number of occupants at an apartment complex also results in additional expenses.  Increasing occupancy beyond two per bedroom will cause virtually every expense to increase, including costs related to maintenance, water, sewage, plumbing, and electricity.  Increasing occupancy will impact noise levels and complaints, parking availability, strain appliances and plumbing, generate more trash, and increase maintenance expenses.  It also results in increased fire safety concerns and liabilities.  In addition, increasing occupancy would require Defendants to raise rents to capture expense increases, which negatively impacts an

apartment's desirability.  Increasing occupancy would also result in increased insurance costs. Each of Defendants' properties has its own insurance policies for property insurance and for liability insurance, the cost of which has tremendously increased in recent years.  Changing the occupancy policy puts Defendants at risk of increased insurance rates to a point where Defendants might not be able to get insurance at all.

Defendants conduct semi-annual inspections of occupied apartment units.  If a property manager or leasing agent becomes aware that a unit has occupants that exceed Defendants' occupancy standard, Defendants notify the tenants of the violation in writing.  Most tenants have a lease.  If the tenants who are violating the occupancy standard are under a lease and do not move out or transfer by the end of the lease term, Defendants give them sixty 60 days' notice of non-renewal.  Defendants rarely have month-to-month tenants.  However, if Defendants discover that a month-to-month tenant is violating the occupancy cap, Defendants serve the violating occupants with a move-out notice, and the tenant must either move out or reduce household size.

### D.    Occupancy Policies in the Law

Occupancy policies limiting occupants to two persons per bedroom are legal and common standards in property management.  No federal law prevents apartment owners and managers from implementing occupancy standards.  Neither the Fair Housing Act  nor the United States Department of Housing and Urban Development has an explicit standard or rule governing numerical occupancy restrictions imposed by a housing provider.

Indiana's residential landlord-tenant statute, Ind. Code § 32-31-2.9-2 "does not prohibit an owner or landlord from refusing to rent a rental unit on the basis of a reasonable occupancy

standard." Ind. Code. § 32-31-8-7(a).[2]  Although Indiana offers a safe harbor, it need not be met

to be deemed "reasonable" under the statute.  The statute offers that an occupancy standard will

be presumed to be reasonable if it conforms with the following requirements in Ind. Code § 32-

31-8-7(b):

> (1) It permits two (2) individuals per bedroom; and
> (2) the owner or landlord:
>> (A) does not include infants less than one (1) year of age in the individuals
>> per bedroom count under subdivision (1); and
>> (B) increases the number of individuals per unit by considering whether the
>> configuration of a unit includes a:
>>> (i) den;
>>> (ii) library;
>>> (iii) finished basement; or
>>> (iv) loft;
>> that could reasonably be used as a sleeping area, unless doing so would violate
>> applicable state and local codes, including fire codes.

The statute explicitly holds that an "owner or landlord is not required to consider a kitchen,

dining room, living room, bathroom, hallway, or closet as a sleeping area." Ind. Code 32-31-8-

7(c).

Indiana does not have a minimum or maximum number of occupants that must be

allowed in an apartment unit.  Rather, counties and municipalities in Indiana can set their own

limitations for occupancy standards and square footage requirements per occupant.  St. Joseph

County, where Remington Court Apartments are located, does not have any rules governing

occupancy standards for multi-family housing.  Marion County, on the other hand, follows the

---

[2] At Defendants' request [Filing No. 101], the Court took judicial notice of Indiana Code § 32-31-8-7, as well as Indiana Code § 22-9.5-5-1, Chapter 10 of the Code of Health and Hospital Corporation of Marion County, and the Fair Housing Act (42 U.S.C. §§ 3601 *et seq*.).  The Court also took judicial notice of various municipal ordinances at Plaintiff's request [Filing No. 107], including §744-402-1, Table 744-402-1, of the Revised Code of the Consolidated City and County of Indianapolis, Marion County, and Off-Street Parking Regulations of St. Joseph County, Indiana.  [Filing No. 110.]

Code of the Health & Hospital Corporation of Marion County to prevent multi-family apartments from over occupying units. The Marion County Code lists the maximum number of occupants allowed to occupy a unit based on square footage. Defendants are not currently violating any local law or ordinance, including Marion County. As long as an apartment does not exceed the number of occupants per square footage, the complex is in compliance with Marion County Code. Nothing in the Marion County Code prevents apartment owners from establishing more strict occupancy standards, either.[3]

### E.    Plaintiff's Investigation

On February 20, 2020, Plaintiff received a complaint related to Defendants' occupancy standard from a man who alleged that someone from the Carlyle Court Apartments told his stepson's household—comprised of two adults and three minor children—that they had too many people to rent a two-bedroom apartment. Neither the man who called Plaintiff nor his stepson are parties in this case. Plaintiff then investigated whether the Carlyle Court Apartments uses a numerical occupancy standard, and if so, what the restriction is and how it is applied. Plaintiff assigned a fair housing tester to call the Carlyle Court Apartments posing as a potential applicant married with three children seeking a two-bedroom apartment. The test corroborated the complainant's allegations that Carlyle Court Apartments have a numerical occupancy restriction of two-per-bedroom. Plaintiff next sought to determine whether the occupancy standard was in effect at other apartments operated by Defendants. Staff members reviewed the websites for various properties to determine the size range of two-bedroom units. They tested two additional

---

[3] Evidence was also presented at trial establishing that the Town of Speedway, Indiana has an occupancy policy that requires no more than two persons per bedroom, not including persons under the age of one. Defendants operate properties within or on the line of the Town of Speedway, but none of those properties are at issue in this lawsuit.

properties: Windsor Court Apartments in Marion County and Remington Court Apartments in Mishawaka, Indiana (St. Joseph County).  A tester contacted each property as a potential applicant married with three minor children and seeking a two-bedroom apartment.  Each tester was told the units could only accommodate four people.  After completing the testing, Plaintiff mailed letters to all current and former tenants at the Carlyle Court, Windsor Court, and Remington Court, but Plaintiff did not receive any response from residents at these properties related to familial status or Defendants' occupancy standard.

In July 2021, Plaintiff filed three administrative complaints with the Indiana Civil Rights Commission.  The ICRC then issued a finding that there was "reasonable cause and probable cause to believe that an unlawful discriminatory practice occurred in this instance" at each of the three apartment complexes.  The ICRC concluded that a "public hearing is necessary to determine whether a violation of the Indiana Civil Rights Law occurred as alleged herein."

### F.    Procedural Background

In lieu of litigating in state court or before an ICRC administrative law judge, Plaintiff filed this suit in this Court for injunctive, declaratory, and monetary relief against Defendants. [Filing No. 1.]  Plaintiff's lawsuit alleges that Defendants' occupancy standard discriminates against families with children because it limits occupancy of Defendants' rental units to two persons per bedroom, regardless of the age of the occupants.  Plaintiff is not pursuing a claim for intentional discrimination.  Rather, Plaintiff accuses Defendants of creating a disparate impact on families with minor children through Defendants' occupant policy limiting to two persons per bedroom.

Defendants moved for summary judgment [Filing No. 67], and Plaintiff filed a cross-motion for partial summary judgment as to liability [Filing No. 69.]  The Court denied both

motions.  [Filing No. 89.]  Defendants also moved to preclude expert testimony from Plaintiff's

expert, James Colbert.  [Filing No. 84.]  The Court recognized Defendants' concerns and agreed

that the value of Colbert's testimony remained uncertain.  However, the Court denied

Defendants' motion.  [Filing No. 98.]  Thus, this matter proceeded to a bench trial from

November 12 to 14, 2024.

### G.    Plaintiff's Expert: James Colbert

Colbert is a data manager and analyst for the Polis Center.  Colbert is not a statistician or

an expert in statistics.  He has no specific training or work experience on housing, occupancy

standards, fair housing, housing discrimination, housing laws, or managing and owning

multifamily housing.  Prior to this case (which was the first time he testified as an expert

witness), he had never conducted studies or published work related to occupancy restrictions or

fair housing, and he is not familiar with the legal rules governing occupancy standards.

Plaintiff hired Colbert to tabulate census data and analyze whether Defendants'

occupancy standard has a disproportionate effect on households with minor children.  To

perform his analysis, Colbert used the American Community Survey (ACS) Public Use

Microdata Samples (PUMS).  The ACS data is collected from a data sample of about 1% of the

U.S. population through a yearly survey collected by the U.S. Census using questionnaires.

PUMS data is public microdata that looks at individual-level responses to the ACS.  When

reviewing PUMS data, an analyzer can only review data from the state level or from a Public

Use Microdata Area (PUMA), which is an area that contains at least 100,000 people.  PUMS

data only accounts for a limited number of variables for data collected from households: tenure

(owned or rented), number of people in households, age of occupants, rents, and rent

adjustment variables.  There are no variables for square footage of the household, type of

household (apartment or house), amenities, public transportation, or a tenant's preference.  The surveys rely on self-reported data, so the data is only accurate if the respondent answered accurately.  Colbert was not involved with compiling the ACS or PUMS data he used, nor is he an expert in the compilation data.

Colbert examined data from 2017 to 2021.  He did not sample data from other years to verify his findings.  Using PUMA data from 2017 to 2021 for the PUMA of Defendants' apartment locations, Colbert made three central findings.  First, Colbert concluded that as the number of occupants in a rental household increase, the more likely the household is to contain at least one minor child.  Colbert's results are skewed, however, because he failed to account for the fact that one-person households are almost always going to be adults, which makes it appear that households with 1 to 2 persons compared to 3 to 4 persons are far less likely to include children.

Second, Colbert considered whether rental households with minor children would be disproportionally affected by a landlord's occupancy standard of two persons per bedroom by calculating a "risk for disparity ratio."  Colbert concluded that in all relevant geographic areas, rental households with children are more likely to be restricted from housing based on the landlord's restrictions.  Thus, Colbert found that large households more likely will have more children, and Defendants' occupancy cap would discourage children and have a disproportionate effect on households with children.

Third, Colbert looked at tenant rosters for Carlyle, Windsor, and Remington from August 9, 2022.  [Filing No. 42-18.]  Colbert then compared the percentage of minor children living in those apartments on August 9, 2022, with the percentage of rental households with minor children in Indiana, Marion County, St. Joseph County, and the relevant PUMAs were

Carlyle, Windsor, and Remington are located. Colbert referred to the roster as "just a snapshot I was provided." [Filing No. 132, at ECF p. 281.] Colbert never asked for any additional data, nor did he receive any information about Defendants' applicants for apartment units. Colbert concluded that for the three apartment complexes in question, the percentage of children living at the apartments are lower than the percentage of children living in rental households in larger geographies in which the complexes are contained. As noted, the tenant rosters he reviewed merely showed a snapshot in time, so the number of families with children might be different the very next day. Thus, at best, Colbert's opinion is valid only for an extremely short period of time: August 9, 2022.

In addition, the ACS and PUMS data Colbert relied on was not limited to multifamily apartments. Rather, Colbert looked at all "rental households," which is defined broadly and includes all properties rented, regardless of square footage, number of bedrooms, or other amenities, whether it be in houses, townhomes, duplexes, or multifamily apartments. Colbert failed to consider extraneous factors and preexisting conditions that likely impacted the results of his data extrapolation. For example, Colbert did not consider that a family with multiple children might not want to live at these properties due to square footage, rental prices, number of bathrooms in units, school districts, proximity to employers, public transportation access, or other factors. Colbert never reviewed school district ratings or whether children could walk or bus to school, nor did he inquire into amenities such as playgrounds, basketball courts, treehouses, or playing fields. In making his conclusions, Colbert did not read any deposition testimony, review any exhibits, view any floor plans, compare rent prices to competitors, study the square footage of Defendants' apartments, or consider different amenities offered by Defendants.

Colbert's theory and techniques were never subjected to peer review or publication. Colbert conceded he has only a "layman's sense" of what could influence occupancy. Colbert had no knowledge as to whether occupancy increasing results in increased vermin, increased wear and tear, or faster devaluation of property. Colbert did not have an opinion on whether Defendants' policies caused a discriminatory effect. Colbert acknowledged that correlation is not the same thing as correlation and admitted he could not offer an opinion on causation or even correlation. [Filing No. 132, at 297-298.] Colbert agreed that he did not examine any causal factors of the challenged policy in his findings, stating, "I am not opining on causation." [Filing No. 132, at ECF p. 295.] When Defendants asked during cross-examination if Colbert had only determined a correlation in the numbers, Colbert clarified: "It's not even a correlation. It's a disparity." [Filing No. 132, at ECF p. 297.]

### H.    Defendants' Expert: Sandra Clark

To support their arguments at trial, Defendants utilized expert Sandra Clark. Clark has extensive experience in property management and ownership. She has been involved with property management since the age of 18 and owns multiple rental properties. She also ran her own property management business. Clark has been retained as an expert witness for approximately a decade in over a dozen cases.[4]

Clark did not visit Defendants' properties at issue in preparing her opinions. However, she did review floor plans, collect information on the properties, and conduct independent research. Clark concluded that a two-person per bedroom occupancy limit is consistent with

---

[4] The California Housing Development has cited Clark's properties for multiple possible code violations, including fire safety, sanitation, maintenance, and plumbing. These were all minor violations that Clark remedied. The Court does not find that this impacts the value of Clark's testimony.

what is best for these properties.  Specifically, Clark testified that Defendants' units are small in relation to others in the market, and if occupancy standards were to change, there would be many negative impacts.  For example, there are often problems trying to refit new water heaters into older bathroom spaces.  While water heaters come in different shapes and sizes, today's larger heaters mean space becomes an issue.  The age of the buildings could lead to an increased risk of bursting pipes.  Clark noted that the apartments have limited storage, so additional occupants would mean adding additional clutter and result in less efficient cleaning, which would increase the possibility of dust mites, roaches, and bed bugs.  Extra people in units also results in these people taking additional showers and does not allow the showers to properly dry.  This is particularly noteworthy in units like the ones in Defendants' properties, which do not have windows.  Clark also testified that many tenants typically do not properly use exhaust fans, which can lead to mold, peeling paint, and grout and ceiling deterioration.

Regarding parking, Clark said adding even 50 additional drivers would create a big shortage of parking, particularly since the units at issue do not have street parking.  In relation to trash, Clark stated that Defendants' properties are currently maxed out regarding the number of trash pickups they can schedule.  Defendants would need to add more trash dumpsters, but Clark did not know whether the properties had room for this.  Defendants could raise rents to cover additional costs, but Clark cautioned that the units must stay within market conditions; raising the rent too much would result in tenants going to other properties.  Clark testified that it is common sense that as occupancy increases, parking complaints increase, noise pollution increases, more trash accumulates, water and sewer usage increase, and there is more wear and tear on the property.

## III.    Conclusions of Law[5]

### A.    Fair Housing Act

The federal Fair Housing Act makes it unlawful to refuse to rent housing to any person because of their familial status. 42 U.S.C. § 3604(a). "Familial status" is defined as "one or more individuals (who have not attained the age of 18 years)" living with a parent or another person having legal custody of them or within a designee of such person. 42 U.S.C. § 3602(k). The Indiana Fair Housing Act mirrors the FHA.  Ind. Code. § 22-9.5-1-1(3).  FHA claims may proceed under a disparate treatment or a disparate impact theory of liability. *See Texas Dept. of Housing and Comm. Affairs v. Inclusive Communities Project, Inc.*, 576 U.S. 519, 524 (2015). Plaintiff solely alleges that Defendants violated the FHA under a disparate impact theory of liability.  "In contrast to disparate treatment cases, where a plaintiff must establish that the defendant had a discriminatory intent or motive, a plaintiff bringing a disparate-impact claim challenges practices that have disproportionately adverse effects on minorities and are otherwise unjustified by a legitimate rationale." *Inclusive Communities Project*, 576 U.S. at 524 (internal citation and quotation marks omitted).

To prevail on a disparate impact claim under the FHA, the plaintiff must establish a *prima facie* case and show that "the defendant's practices have a disproportionately adverse effect on the protected class and are otherwise unjustified by a legitimate rationale." *Trimuel v. Chicago Housing Auth.*, 695 F. Supp. 3d 972, 982 (N.D. Ill. 2023) (internal citation and quotation marks omitted).  Once the plaintiff has established a *prima facie* case, the burden

---

[5] In ruling on the parties' cross motions for summary judgment, the Court found Plaintiff met the necessary standing requirements to bring these discrimination claims.  [Filing No. 89, at ECF p. 8.]  At trial, Plaintiff presented additional evidence of damages.  Defendants did not raise any standing challenges or concerns at trial.  Thus, the Court once again finds Plaintiff has standing to pursue these claims.

shifts to the defendant to prove that the challenged practice is necessary to achieve one or more substantial, legitimate, nondiscriminatory interests. *Inclusive Communities Project*, 576 at 524 (citing 24 C.F.R. § 100.500(c)(2)). If the defendant satisfies its burden of proof, then the plaintiff may still prevail upon proving that the substantial, legitimate, nondiscriminatory interests supporting the challenged practice could be served by another practice with a less discriminatory effect. 24 C.F.R. § 100.500(c)(3).

Plaintiff failed to establish that Defendants violated the FHA through disparate impact because (1) Plaintiff cannot prove that Defendants' occupancy standard caused a disparate impact on families with children; (2) Defendants established that an occupancy policy of two persons maximum per bedroom is necessary for legitimate, non-discriminatory interests, and (3) Plaintiff failed to establish that there are less discriminatory alternatives that equally accomplish Defendants' interests. *Inclusive Communities Project*, 576 U.S. at 524.

### B.    *Prima facie* Case, Robust Causality, and Exclusion of Expert Testimony

To establish a *prima facie* case of disparate impact, Plaintiff must first identify an outwardly neutral policy and compare how that policy affects a protected class compared with others. *Id.* at 527, 542-43. *See also Dunnivan v. Mitchell*, No. 1:21-cv-02271-SEB-TAB, 2022 WL 3716528, at *3 (S.D. Ind. Aug. 29, 2022) ("To allege disparate impact liability, a plaintiff first must make a *prima facie* showing of disparate impact. That is, the plaintiff has the burden of proving that a challenged practice caused or predictably will cause a discriminatory effect." (Internal citations and quotation marks omitted)). Defendants' occupancy standard is an outwardly neutral policy that impacts a protected class, because it excludes households with three or more minor children from renting at Defendants' apartment complexes.

However, Plaintiff's *prima facie* case must go one step further and demonstrate the essential element of robust causality. *See Inclusive Communities Project*, 576 U.S. at 542 ("[A] disparate-impact claim that relies on a statistical disparity must fail if the plaintiff cannot point to a defendant's policy or policies causing that disparity. A robust causality requirement ensures that racial imbalance does not, without more, establish a prima facie case of disparate impact and thus protects defendants from being held liable for racial disparities they did not create. (Internal quotation marks, brackets, and ellipses omitted)). Plaintiff claims that because households with more occupants tend to include families with minor children, and Defendants do not have a high percentage of families with children residing at the apartments in question, then Defendants' occupancy standard must cause the low percentage of families with children, and there can be no other explanation.

Plaintiff failed to demonstrate robust causality. Plaintiff largely relies on testimony from its expert, James Colbert. At the conclusion of Colbert's testimony, Defendants renewed their motion to strike Colbert because he was not qualified to give an expert opinion on the topics rendered. Defendants reiterated their argument that Colbert's methodology was neither reliable nor based on sufficient data or facts. Plaintiff opposed the motion, and the Court took it under advisement.

Federal Rule of Evidence 702 and the Supreme Court's opinion in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) govern the admissibility of expert testimony. An expert is only allowed to testify if his testimony is based on sufficient data and is the product of a reliable methodology correctly applied to the facts of the case. *Gayton v. McCoy*, 593 F.3d 610, 616 (7th Cir. 2010). The plaintiff bears the burden "to show, by a preponderance of the evidence, that the testimony meets the *Daubert* standard." *Downing v. Abbott Lab'ys*, 48

F.4th 793, 809 (7th Cir. 2022). Plaintiff failed to meet its burden of proving that Colbert is qualified and that his opinions were reliable.

Colbert is not qualified to give expert opinion on the issue of fair housing. He is not a statistician or an expert in statistics, and he has no specific training or work experience on housing, occupancy standards, fair housing, housing discrimination, housing laws, or managing and owning multifamily housing. Colbert and Plaintiff failed to explain how Colbert's experience in data management leads to his conclusion that Defendants' occupancy standard had a disparate impact on families with children, why his experience is a sufficient basis for the opinion, or how Colbert's experience reliably applied to the facts. Colbert had no education related to PUMS data, no experience collecting ACS or PUMA data, and no involvement in the compilation of the data he used to form his opinion.

Even if the Court found Colbert qualified to give an opinion, his opinions are excluded because his methodology is not based on sufficient facts and data. Colbert admitted his techniques were never subject to peer review or publication. Neither Plaintiff nor Colbert presented evidence related to the known potential rate of error to Colbert's techniques. When making his findings, Colbert only considered four variables: whether someone rented or owned, the age of occupants, rent, and rent adjustment variables. Colbert never looked at floor plans of Defendants' properties, and he knew nothing about their square footage. As noted above, Colbert failed to consider any extraneous variables or potential key relevant factors that might have explained the lack of families with children choosing to live at Defendants' properties, such as less square footage, small appliances, school districts, or parking. Colbert failed to identify another study that, like his, failed to account for alternative causal variables in a single context.

Colbert did not compile the PUMS or ACS data he relies on, so he could not account for its veracity. The ACS data is collected from a sample of only 1% of the U.S. population. It is also self-reported data, which means it is completely reliant on the respondent answering the survey accurately. Colbert only considered a data set from 2017 to 2021. He failed to test those results against other data sets, and he presented no testimony about his methodology's margin of error. In addition, when comparing this data with Defendants' properties, Colbert relied on a snapshot in time: tenant rosters for the properties at issue on August 9, 2022. Tenants renting apartments change daily, and without any further data points, it is impossible to know if the data he relied on was consistent with any point in time beyond that moment on August 9.

In addition, the analytical gaps between the data and Colbert's conclusions are too great. Colbert's methodology is not limited to prospective tenants or actual applicants. Rather, his analysis assumes all families with children who currently rent (in any type of housing) want to live at Defendants' apartments but were excluded from doing so, which resulted in a disparate impact on many families with children. However, Colbert's methodology results in a skewed result, as it is not clear what number of families captured actually desired to live at Defendants' apartments. Colbert failed to consider any alternative causal variables. Instead, he just assumed Defendants' occupancy standard was the only reasonable explanation for fewer families with children living at Defendants' Windsor, Carlyle, and Remington apartments. Plaintiff's contention that a tenant's living preferences are immaterial is not persuasive. To be a prospective tenant, someone must have the desire to live at Defendants' apartments. Whether a tenant prefers to live at Defendants' apartments due to these key variables is relevant.

Plaintiff also argues that Defendants' occupancy standard deprives families with children of the right to decide for themselves whether to live at Defendants' properties.

However, Plaintiff presented no evidence of statistically significant numbers of families who decided to live at Defendants' units but were denied the choice. And this is not the standard. Plaintiff must present reliable evidence showing that Defendants' occupancy policy *caused* a disparity. They failed to do so. Colbert directly stated that he was not opining on causation. [Filing No. 132, at ECF p. 295.] At most, he testified that a disparity exists. [Filing No. 132, at ECF p. 297 ("It's not even a correlation. It's a disparity.").] Colbert's testimony was not based on sufficient facts or data and is not the product of reliable principles and methods, as required by Fed. R. Evid. 702(b)-(d). It is too speculative. For all these reasons, Defendants' renewed oral motion to exclude Colbert is granted, and the Court excludes Colbert's opinions from its analysis.

Even if the Court allowed Plaintiff to rely on Colbert's testimony, Plaintiff fares no better. Plaintiff's statistical evidence fails to show that Defendants' occupancy standard caused a discriminatory effect on families with children. Colbert acknowledged there is a difference between causation and correlation. He admitted that he had no opinion on causation, or even correlation. Colbert succinctly stated, "I am not opining on causation." [Filing No. 132, at ECF p. 295.] Then, Colbert went further to specify that he could not find anything more than a disparity. This does not demonstrate the necessary robust causality. To hold Defendants liable based on Colbert's testimony and the related statistical evidence would hold Defendants liable for a disparity without evidence they created such disparity.

At summary judgment, the Court, when weighing the evidence in favor of the non-moving party, the Court concluded that Plaintiff established a *prima facie* case of disparate impact. However, that conclusion did not hold up at trial, when the Court was able to fully weigh the evidence, consider Colbert's testimony, and determine his conclusions were not

supportable.  Thus, at trial, Plaintiff failed to establish its *prima facie* case that Defendants' occupancy standard caused any existing disparity, as opposed to some other variable or preexisting condition.

### C.     Necessary, Valid Interests for Defendants' Occupancy Policy

Even assuming Plaintiff succeeded in proving a *prima facie* case of disparate impact, Plaintiff is still not entitled to judgment, because Defendants demonstrated their occupancy standard is necessary to achieve multiple valid interests.  Once a plaintiff establishes its *prima facie* case, the burden shifts to the defendant to establish that the occupancy restriction "is necessary to achieve one or more substantial, legitimate, nondiscriminatory interests."  24 C.F.R. § 100.500(b)(1)(i), (c)(2).  Defendants provided ample evidence, from credible, knowledgeable witnesses—including Defendants' expert in property management Sandra Clark, controller Rick Roberts, and associate vice president Paula Condon—of legitimate, non-discriminatory reasons for the occupancy standard.  Plaintiff provided no contradictory evidence.

Defendants have a legitimate interest in maintaining the desirability of their properties. Defendants provide quality, well-maintained, and affordable housing to families in Indiana.  All of Defendants' apartment complexes house families with children.  The existence of highly desirable and affordable multi-family property does not just naturally occur.  Defendants implement many policies and procedures to maintain clean, respectable, desirable, and affordable apartments for families.  The combination of these policies—including the occupancy cap of two persons per bedroom—has allowed Defendants to successfully operate for decades.

Defendants also have a legitimate interest in preventing excessive wear and tear of their buildings, in both the apartment units and common areas.  In addition to increasing overall

maintenance expenses, more wear and tear impacts a business' long-term financial plans. Ensuring Defendants' apartments do not become overcrowded is vital to Defendants' goal of maintaining clean and desirable apartments at an affordable price.  It is common sense that more people create more noise, clutter, wear and tear, trash accumulation, and strain on pipes and appliances.  Relatedly, Defendants have a legitimate business interest in controlling costs and expenses.  Defendants demonstrated that to maintain their properties with more tenants, there would be increased costs for common area utilities, water and sewage, trash, maintenance, personnel, third-party exterminators, and insurance.

Providing adequate parking is a legitimate business interest.  Defendants have limited parking available at these complexes, and there are no street parking options due to the location of the properties.  Plaintiff does not dispute that parking is limited, but instead claims it could be accommodated in other ways.  Plaintiff suggests that Defendants should give one-bedroom units one parking permit instead of two, or reduce the parking permits they give out.  This would only exacerbate existing parking concerns.  Additional parking cannot be added at Remington.  To add additional parking spaces at Carlyle or Windsor would require compromising green space, which is valuable to Defendants' tenants.

Ensuring tenants have adequate access to hot water and appropriately sized appliances are legitimate, nondiscriminatory business interests.  Defendants presented evidence of the size of their water heaters and evidence that the installed water heaters could not sustain many additional occupants.  Defendants already receive complaints about a lack of hot water, which would inevitably increase with more occupants.  Defendants cannot merely add larger hot water heaters, as water heater units are expensive, the process is time consuming, and the water heaters are in designated spaces that cannot accommodate larger units.  Defendants similarly

have a substantial interest in ensuring tenants have adequately sized appliances and in avoiding strain on internal plumbing and related structures, all of which are at risk with increased occupancy.

Finally, Defendants have a substantial, legitimate interest in ensuring they adhere to local ordinances and for implementing their own, slightly stricter occupancy standard given the uncertainty that local codes may change and the fact that Defendants have properties in various localities. Even if Defendants could add additional occupants to units without violating local code, such as the Marion County code, there is no requirement under the FHA or any other law that Defendants must allow as many occupants as legally possible.

### D. Plaintiff failed to demonstrate less discriminatory alternatives

In the final step of the disparate impact analysis, if the defendant provides a legitimate justification for the challenged practice, the plaintiff must demonstrate that an alternative practice with a less discriminatory effect could serve those legitimate interests. In doing so, the plaintiff must show specific, viable, equally effective alternatives beyond vague proposals. *See, e.g., Chicago Teachers Union Loc. 1 v. Bd. of Educ. of City of Chicago*, 419 F. Supp. 3d 1038, 1052 (N.D. Ill. 2020) (describing third step in the Title VII process, which mirrors the FHA burden-shifting framework, as the burden shifts back to the plaintiff to show that an equally valid and less discriminatory practice was available). Plaintiff failed to put forward viable, less discriminatory alternatives to Defendants' occupancy policy that would equally serve Defendants' interests. Plaintiff has not presented reasonable alternatives with the required specificity, nor has it demonstrated that any alternative is equally effective, especially considering costs and burdens an alternative policy would impose.

Plaintiff argues that if Defendants applied the occupancy limitations set forth in the Marion County Health and Hospital Code, more families with minor children would qualify for tenancy under the occupancy cap.  However, Plaintiff failed to show Defendants violated any state or federal fair housing laws.  At trial, the Court asked Plaintiff what specific relief they were seeking, and Plaintiff stated it seeks a declaratory judgment that Defendants' current occupancy restriction violates the FHA, and that it wants Defendants to adopt a reasonable occupancy restriction that is consistent with the local code or ordinance in the area where the property is located.  Plaintiff acknowledged that Defendants' occupancy restriction does not violate local ordinances or codes, but argued they could use the code in a way that would allow them to increase occupancy.

Defendants could alter their occupancy policy to carve out an infant exception, like the Marion County Code and Town of Speedway.  However, Defendants are not required to do so. Defendants are following the law.  None of the occupancy standards applicable to the properties at issue require Defendants to have an occupancy standard different than the standard currently in place.  Additionally, Defendants have complexes in a variety of local jurisdictions.  From a business practicality standpoint, limiting occupants at all of Defendants' properties based on quantity is the most efficient, non-discriminatory way for Defendants to control costs, retain tenants, and maintain property values.

Plaintiff also argues that less discriminatory alternatives available to Defendants include increased security deposits, qualification keys questioning tenants about their histories, additional inspections of units, and increased utilities fees.  However, these alternatives will not accomplish Defendants' legitimate business goals as effectively as Defendants' occupancy standard without imposing additional costs and burdens.

Trial testimony established that security deposits are not meant to primarily recover costs for damage to apartments. Instead, they mostly safeguard management companies against a tenant leaving without paying rent. Even if used to recover for damages, many negative impacts to a property cannot be obtained through the security deposit. Security deposits typically can only cover damage beyond normal wear and tear, and normal wear and tear will increase with more tenants. In addition, security deposits do not capture expenses for wear and tear in common areas, increased electric and gas bills in common areas, increased water and sewage bills, or increased insurance costs. They also do not alleviate increases in maintenance costs, parking concerns, noise complaints, hot water issues, or excess trash.

Qualification keys are a way for property managers to question prospective tenants about their history of non-payment or trashing apartments and determine if they are qualified to rent. While Defendants could utilize a qualification key, it would be nearly impossible to adequately measure how much water a particular person will use or how much trash they produce. Using a qualification key during the application process also cannot sufficiently guard against overcrowding. A qualification key is limited in the information it can provide to management companies about prospective tenants.

Defendants could conduct more inspections to increase their knowledge of any issues arising at apartments. However, they already conduct semi-annual inspections, which do not stop the existence of clutter, vermin, mold, mildew, and fire safety violations. Rather, these inspections address the existence of these situations that already exist. While inspections can be a good management tool, they are not, on their own, enough to prevent the issues associated with increased occupancies. Nor do inspections change the trash concerns, parking complaints, or increased bills.

Increasing utility fees also will neither accomplish Defendants' goals nor be equally effective without imposing additional costs and burdens.  Defendants currently charge all tenants a set monthly fee for water, trash, and sewage.  However, the actual costs at each property vary every month depending on usage at that location.  Thus, unless Defendants adjusted their fee to tenants every month to account for the prior month's usage, the fee could never perfectly cover Defendants' costs.  To do this would be burdensome.  In addition, increasing the utility fee would not account for the fact that Defendants already maxed out on their trash pickups, the increased wear and tear on existing pipes in the apartments, or the associated maintenance that would be required.

Raising rents to accommodate additional expenses likewise would not be as equally effective and would impose additional burdens on Defendants.  Most obvious—an increase in rent makes the property less desirable to current and prospective tenants.  It also would be contradictory to Defendants' stated business model of maintaining high occupancy rates through lower rents, and it seems counterproductive to suggest raising rents would be helpful to families with children.

Accordingly, Plaintiff has not set forth a less restrictive alternative that would equally serve Defendants' interests.[6]

---

[6] Plaintiff also claims Defendants violated the FHA with its rules restricting access to various amenities to children.  *See* 42 U.S.C. § 3604(c) (makes it unlawful to "make, print, or publish, or cause to be made, printed, or published any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination.").  Although both sides briefly address this claim in their proposed conclusions of law, Plaintiff never fully developed this issue at trial beyond pointing out that Defendants subject all occupants to a variety of rules and regulations.  This is not a basis to hold Defendants liable under the FHA.  All of Defendants' properties have children.  Defendants provide amenities that are available to children.  Defendants demonstrated the rules in place are not arbitrary and serve a business purpose to limit children's access to potentially dangerous amenities (like pools, lakes, and ponds) and to minimize Defendants' liability.

## IV.    Conclusion

Plaintiff failed to show Defendants violated any state or federal fair housing laws. Plaintiff's expert, Colbert, is stricken, but even if his testimony were allowed, it would not be sufficient to establish a *prima facie* case of disparate impact under the FHA or IFHA.  In addition, Defendants have legitimate business interests for their occupancy standard, and Plaintiff failed to set forth an equally effective, less restrictive alternative they could use instead to protect those interests.  For all these reasons, Plaintiff's complaint against Defendants is denied with prejudice, and judgment shall issue in Defendants' favor.

Date: 2/5/2025

Tim A. Baker
United States Magistrate Judge
Southern District of Indiana


Distribution:

All ECF-registered counsel of record via email